[No. 1898]

# TURNER LUMBER COMPANY (A CORPORATION), RESPONDENT, *v.* THE TONOPAH LUMBER COMPANY (A CORPORATION), APPELLANT.

[145 Pac. 914]

1. SALES—CONTRACTS OF SALE—NEGOTIATIONS BY LETTER.

Defendant wrote the S. Company that it would like to contract for 1,000,000 feet of lumber and would close a contract at that time, the lumber to be cut during the following season and delivered when dry, and prices to be based on a specified price list then in vogue, and that, if this was satisfactory, it would consider the matter closed until the cutting started, when it would forward a cutting list. The company replied that it would furnish the quantity specified to be cut that season and shipped when dry, the prices to be based on the specified list. Thereafter plaintiff wrote defendant asking for a cutting order, and defendant replied asking if plaintiff would be in a position to furnish 1,000,000 feet. In response plaintiff wrote defendant referring to the previous correspondence and stating that it had succeeded the S. Company. Defendant thereafter sent a cutting order for 700,000 feet. *Held,* that these letters created a contract between the parties, as they evidenced a meeting of the minds as to the amount of lumber, the season in which it was to be cut, and the time of delivery.

2. SALES — PERFORMANCE OF CONTRACT — DELAY IN DELIVERY — REFUSAL TO ACCEPT.

Defendant contracted to purchase from plaintiff 1,000,000 feet of lumber to be cut during the season of 1907 and delivered when dry, and sent plaintiff a cutting order for 700,000 feet. Plaintiff milled and manufactured all of the lumber for which the cutting order was given. There was some evidence that plaintiff was unable to make prompt delivery of specific shipping orders due to climatic conditions and scarcity of transportation facilities on a railroad; but no complaint as to this was made by defendant, and it never gave notice of a rescission or cancelation of the contract or did any acts from which a rescission could be inferred. By reason of defendant's delay in furnishing plaintiff with specifications as to surfacing and sizing the lumber and to its acts in canceling shipping orders previously given and not reviving such orders owing to unsettled conditions, plaintiff was delayed in making deliveries, and, to meet the convenience of defendant, all of the lumber was not delivered during 1907. In 1908, plaintiff wrote defendant insisting that it take the lumber, and defendant replied stating that plaintiff was unable to take care of the orders offered it by defendant and that for that reason defendant would ignore plaintiff's letter and that plaintiff might take any action it might deem fit. *Held,* that plaintiff did not break the contract by failing to deliver the lumber during 1907, especially as there

was nothing from which a failure to deliver the lumber when dry could be inferred, while defendant repudiated the contract by its letter mentioned.

3. SALES—CONTRACTS OF SALE—TIME FOR DELIVERY.
    Under a contract for the sale of lumber to be cut during the season of 1907 and delivered when dry, the seller might justifiably have shipped the lumber to the buyer when the lumber was dry without further shipping orders.

4. APPEAL AND ERROR—REVIEW—ERRORS FAVORABLE TO APPELLANT.
    A party could not complain of the trial court's adoption of an erroneous measure of damages which inured to its benefit.

### ON REHEARING

1. SALES—DAMAGES—COMPUTATION.
    Defendant having repudiated the contract and refused to take the specified quantity of lumber, to save itself from loss plaintiff was compelled to dispose of the lumber at the best market price obtainable. *Held*, that damages should be computed on the basis of the difference between the contract price and the market price for lumber at or about the date of the repudiation of the contract.

APPEAL from Second Judicial District Court, Washoe County; *John S. Orr*, Judge.

Action by the Turner Lumber Company against the Tonopah Lumber Company. From a judgment for plaintiff, defendant appeals. **Affirmed.**

### STATEMENT OF FACTS

The respondent, Turner Lumber Company, plaintiff in the court below, was a corporation engaged in the wholesale milling and manufacturing of lumber and its various products. Their mill was located in the vicinity of Sattley, Sierra County, Cal. The members of the corporation were the Turner Bros. (H. A. Turner, J. M. Turner, and T. K. Turner); and they, together with others, had formerly been known as the Sunset Lumber Company. Some time during the latter part of the year 1906, or the first part of the year 1907, they organized a corporation known as the Turner Lumber Company, which corporation is respondent herein. The appellant, Tonopah Lumber Company, defendant in the court below, was a corporation engaged in the business of retailing lumber and its various products in Tonopah, Goldfield, Rhyolite, Lovelock, and other towns

and mining camps in Nevada. This action grows out of a contract entered into between the parties, wherein the contractual relations and the terms of the contract are established by and contained within a series of letters passing between the parties, as follows:

"Dec. 6th—

"Sunset Lumber Co., Sattley, Cal.—Gentlemen: In receiving communication from you we were given to understand that you had sold out your holdings to the Truckee Lumber Company. We would like to have you verify this and if same is not the fact would like to contract with you for a portion of your cut, if not all, for next season. We were very much satisfied with the class of material you have shipped, together with the pleasant business relations existing between us.

"Yours very truly,

"A. R."

"Sattley, Sierra Co., Cal., Dec. 24, 1906.

"Tonopah Lumber Co., Tonopah, Nevada—Dear Sirs: In answer to your letter of Dec. 6, beg to say that while we have sold our timber interests here, the writer, and perhaps all of our firm, expect to continue in the lumber business in this immediate vicinity, and would be pleased to contract with you for between 500 M & a million feet, either at the prices quoted in the Truckee river price list of Sept. 1, 1906, or to be billed according to Truckee river lists at date of shipment.

"Yours very truly, Sunset Lumber Co.,

"By Jas. M. Turner."

"Tonopah, Nev., December 27-06.

"Messrs. Sunset Lumber Co., Sattley, Cal.—Gentlemen: We are in receipt of your letter of December 24th and are pleased to hear that you do not intend to discontinue the lumber business entirely. We would like very much to enter into a contract with you for 1,000,000 feet or as near that as possible, providing, of course, that you will cut the same quality of lumber that you did during last year and if agreeable to you, we are willing to close this contract at the present time, the lumber to be cut during

the coming season and delivered when dry. Prices to be based on Truckee river price list September 1st-06 which is at present in vogue. If this is satisfactory to you, write us a letter to this effect and we will consider the matter closed until such time as you start cutting, when we will forward to you a cutting list.

"Awaiting your reply, we are,

"Yours truly, Tonopah Lumber Co.,

"By A. J. Crocker.

"R."

"Sattley, Sierra Co., Cal., 1-7-07.

"Tonopah Lumber Co., Tonopah, Nev.—Gentlemen: Replying to your favor of the 27th ult. addressed to the Sunset Lumber Co., beg to say that the writer and those associated with him will be pleased to furnish you the 1,000,000 feet or more of No. 1 common pine and fir to be cut this season and shipped when dry. The prices to be based on the Truckee river price list of Sept. 1st, 1906. We expect to cut 3,000,000 feet including all grades, and would be pleased to furnish you some uppers, such as finish, rustic, ceiling, flooring, ship-lap, moldings, etc. based on the same list as above. Should you desire to have any of this, please let us know as soon as convenient. We expect to do business under a new name, and will notify you of the same as soon as our articles of incorporation are filed.

"Awaiting your reply, we remain,

"Yours respectfully,

"Sunset Lumber Co.,

"By Jas. M. Turner."

"Tonopah, Nev., January 12th, 1907.

"Sunset Lumber Co., Sattley, Cal.—Gentlemen: We are in receipt of your letter of Jan. 7th, and note that you will accept our cutting order for 1,000,000 feet of No. 1 common pine and fir; price to be based on Truckee river price list of Sept. 1st, 1906. In regard to the other grades of lumber, we will say that if your grade of finish is up to the standard of the mills in that section, we will undoubtedly be able to take some of it, and possibly,

also some ship-lap. We will not be able to use any rustic, ceiling or flooring unless something unforeseen happens, as we handle this material only in the Oregon pine. We would be pleased to receive a list from you as to how much lumber you still have on hand for us awaiting shipment.

"Yours very truly,

"Tonopah Lumber Co.,

"By A. J. C.

"2."

"Sattley, Cal., 4-23-07.

"Tonopah Lumber Co., Tonopah, Nev.—Gentlemen: Please send us as soon as convenient a cutting order of the lumber you desire on the contract between us. We have made arrangements with the Washoe County Bank for money on the strength of this order, and therefore ask that you make all future remittances direct to the bank. We also suggest that you write that bank to the effect that we have notified you to make all remittances on this order direct to them.

"Thanking you, we remain,

"Yours respectfully,

"Turner Lumber Co.,

"By F. H. Turner."

"Tonopah, Nev., April 24th, 1907.

"Turner Lumber Co., Sattley, Calif. — Gentlemen: Kindly let us know at once if you will be in a position to furnish us with one million feet, a cutting for which will be sent you later on. Also the prices on same f. o. b. cars.

"Tonopah Lumber Co., by A. Revert."

"Sattley, Cal., Apr. 27, '07.

"Tonopah Lumber Co., Tonopah, Nev. — Gentlemen: Replying to your favor of the 24th, will say that we wrote you on the 23d inst., regarding a copy of cutting order of your requirements. On Jan. 7, Jas. M. Turner, of the Sunset Lumber Co., wrote you, stating that we would be in a position to furnish you a million feet of lumber, but would do business under another company name, but we overlooked the fact that we were to inform

you of the new name of our company.   In the letter of Jan. 7, Mr. Turner stated that we would accept your order for a million feet, based on Truckee river price list of Sept. 1st, 1906, as per your letter of the 27th of Dec. '06. We are now doing business under the above name, having incorporated and succeeded the Sunset Lumber Co., and lumber firm of the writer.

"Trusting that the above fully explains matters, we are,
"Yours respectfully,
"Turner Lumber Co.,
"By F. H. Turner."

"Sattley, Cal., May 2, 1907.

"Tonopah Lumber Co., Tonopah, Nev. — Gentlemen: We are in receipt of your favor of the 29th ult., containing cutting order for 700,000 feet lumber.   We note that you will send additional orders soon for 300,000 feet. We also note that the order calls for a large percentage of small stuff, and we would ask if you can make the additional orders for large stuff, such as 6x6, 6x8, and 8x8?

"Thanking you, we are,
"Yours respectfully,
"Turner Lumber Co.,
"By F. H. Turner."

Plaintiff's Exhibit 9 is an instrument purporting to be what is termed a "cutting order," sent to respondent company by appellant company pursuant to the correspondence that had previously passed between them, and is for 700,000 feet of lumber.

Pursuant to the agreement between the parties, entered into by these letters, respondent was to receive $18 per thousand for the lumber, delivered at Boca, a point on the main line of the Southern Pacific Railroad. It appears that, of the 1,000,000 feet of lumber mentioned in the letters, only 700,000 feet was ever put in the form of a cutting order by appellant; and, of the 700,000 feet described in the cutting order, only 319,087 feet was received by appellant.

The trial court established as the basis of the measure

of damages the difference between the contract price of
the lumber, $18, and its value in the market at the time
the suit was brought, fixing the same at $14.50 per
thousand. For the lumber disposed of to third parties
by respondent, the court allowed damages for the dif-
ference between the price received and the contract
price, taking into consideration the cost of production
and transportation. Judgment was entered for respon-
dent in a sum equal to the difference between the market
price at the time of the bringing of the suit and the con-
tract price, for the lumber yet remaining in the hands of
respondent, basing the damages on 380,913 feet. Pur-
suant to the finding of the court in this respect, judg-
ment was entered in favor of respondent for the sum of
$2,148.20.

*Mack & Green*, for Appellant:

Respondent being in default, appellant had the right
to rescind the contract, and to refuse to accept or pay
for further deliveries under it. (24 Am. & Eng. Ency.
Law, 1110; *Norington* v. *Wright*, 115 U. S. 188, 5 Fed.
768; *In Re Kelly*, 51 Fed. 194; *Pope* v. *Porter*, 7 N. E.
304; *National Surety Bank* v. *Long*, 125 Fed. 887; *Ross
Mehan F. Co.* v. *Royer W. Co.*, 83 S. W. 167.)

If appellant was guilty of any breach of the contract,
the measure of damages should be the difference between
the contract price and the market value of the lumber
at the place of delivery at the time of the breach. (*Bige-
low* v. *Legg*, 6 N. E. 107; *Whitmore* v. *Coats*, 14 Mo. 9;
*Rand* v. *White M. R. R.*, 40 N. H. 79; *Rider* v. *Kelly*, 32
Vt. 268; *Gunson* v. *Madigan*, 13 Wis. 67; *Ballantine* v.
*Robinson*, 64 Pa. St. 177; *Barry* v. *Cavanaugh*, 127 Mass.
394; *Fireworks Co.* v. *Polites*, 18 Atl. 1058; *Brownlee* v.
*Bolton*, 6 N. W. 657; Sutherland on Damages, 3d ed. vol.
1, sec. 51; Page on Contracts, vol. 3, sec. 1590; Sedgwick
on Damages, 9th ed. vol. 2, sec. 753; Elliott on Contracts,
vol. 5, sec. 5095; Am. & Eng. Ency. Law, vol. 24, p. 1114;
*Watt* v. *Nev. C. R. R.*, 23 Nev. 154; *Newman* v. *Kane*, 9
Nev. 234.)

*Summerfield & Curler* and *Summerfield & Richards*, for Respondent:

Delay or nondelivery having been caused by appellant, breach of the contract was on its part. (Am. & Eng. Ency. Law, 2d ed. vol. 24, pp. 1073, 1074, 1087, 1110, 1111.) Appellant could not rescind as to part of the contract and affirm as to the remainder. (*Norington* v. *Wright*, 115 U. S. 188.) The right to rescind must be promptly exercised. (Am. & Eng. Ency. Law, 2d ed. vol. 24, pp. 111, 112.)

The price received for the lumber at the place of delivery, and the immediate vicinity thereof, where the evidence shows reasonable diligence on the part of the vendor, in the absence of evidence of bad faith on his part, establishés the market value of the lumber at the place and its vicinity. (*Hughes* v. *German Fruit Co.*, 106 Cal. 445; *Morris* v. *Wilbaugh*, 159 Ill. 627; *Hill* v. *Hobart*, 16 Me. 168; *Atwood* v. *Lucas*, 89 Am. Dec. 713; *Wrigley* v. *Cornelius*, 162 Ill. 92; Sutherland on Damages, 3d ed. vol. 3, p. 1859.) The measure of damages is the difference between the contract price and the market value of the manufactured lumber at the place of delivery on the date of the repudiation of the contract. (*Waples* v. *Overacker*, 77 Tex. 7, 19 Am. St. Rep. 727.)

Technical and restricted construction of pleadings is unwarranted in law. (*Lawrence* v. *Milwaukee Co.*, 54 N. W. 797; *Hinckley* v. *Pittsburg B. S. Co.*, 121 U. S. 264; *Hale* v. *Trout*, 35 Cal. 229; *Kimball* v. *Deers*, 108 Iowa, 676; *Tahoe Ice Co.* v. *Union Ice Co.*, 109 Cal. 242; Sutherland on Damages, 3d ed. vol. 3, p. 1869.)

By the Court, MCCARRAN, J. (after stating the facts):

[1] There can be no serious attempt to deny the existence of a contract between the parties to this action. The terms of the contract may be found in the several letters set forth in the statement of facts, and especially in the letter from appellant to respondent dated December 6, and from respondent to appellant December 24, and from appellant to respondent December 27, and from respondent to appellant January 7, 1907. This

contractual relation established by these respective communications was manifested by the letter of April 24 from appellant to respondent, in reply to which respondent referred to former communications between the parties, and especially to respondent's letter of January 7, 1907, wherein they accepted appellant's order for 1,000,000 feet of lumber as per appellant's letter of the 27th of December, 1906. This contractual relation was established at the instance and invitation of appellant, as is evidenced by their letter of December 6, 1906.

The terms of the contract essential to the principal issue in this case are set forth in appellant's letter of December 27, 1906; and this letter, together with respondent's letter in reply thereto, to wit, of date January 7, 1907, in our judgment evidenced a meeting of the minds of the parties as to three essential things in this case; that is, the amount of lumber, the season in which the lumber was to be cut by respondent, and the time of delivery—the latter limited only by a specific condition, to wit, "when dry." In this respect, it may be well to note that respondent's letter of January 7, 1907, in reply to appellant's letter of December 27, 1906, specifically mentions these terms in detail. The letters referred to are as follows:

"Tonopah, Nev., December 27-06.

"Messrs. Sunset Lumber Co., Sattley, Cal.—Gentlemen: We are in receipt of your letter of December 24th and are pleased to hear that you do not intend to discontinue the lumber business entirely. We would like very much to enter into a contract with you for 1,000,000 feet or as near that as possible, providing, of course, that you will cut the same quality of lumber that you did during last year and if agreeable to you, we are willing to close this contract at the present time, the lumber to be cut during the coming season and delivered when dry. Prices to be based on Truckee river price list September 1st-06 which is at present in vogue. If this is satisfactory to you, write us a letter to this effect and we will consider

the matter closed until such time as you start cutting when we will forward to you a cutting list.

"Awaiting your reply, we are,

"Yours truly,

"Tonopah Lumber Co.,

"By A. J. Crocker.

"R."

"Sattley, Sierra Co., Cal., 1-7-07.

"Tonopah Lumber Co., Tonopah, Nev.—Gentlemen: Replying to your favor of the 27th ult. addressed to the Sunset Lumber Co., beg to say that the writer and those associated with him will be pleased to furnish you the 1,000,000 feet or more of No. 1 common pine and fir to be cut this season and shipped when dry. The prices to be based on the Truckee river price list of Sept. 1st, 1906. We expect to cut 3,000,000 feet, including all grades, and would be pleased to furnish you some uppers, such as finish, rustic, ceiling, flooring, ship-lap, moldings, etc., based on the same list as above. Should you desire to have any of this, please let us know as soon as convenient. We expect to do business under a new name, and will notify you of the same as soon as our articles of incorporation are filed.

"Awaiting your reply, we remain,

"Yours respectfully,

"Sunset Lumber Co.,

"By Jas. M. Turner."

Appellant's letter of January 12 amounts merely to a confirmation of the terms agreed upon in the two former communications.

The cutting order sent by appellant to respondent April 29, 1907, pursuant to the contract, for 700,000 feet of lumber, says nothing as to "sizing" or "surfacing."

On June 10, 1907, respondent wrote to appellant as follows:

"Sattley, Cal., 6-10-07.

"Tonopah Lumber Co., Tonopah, Nev.—Gentlemen: Referring again to your letter of the 29th of April, we

would ask if you want the lumber surfaced. And if so, please give us a memo of the thickness and widths wanted. We would also like to receive your cutting order for the 300,000 feet, as per your letter of May 6th, as we will soon be ready to commence cutting on it.

"Yours respectfully,

"Turner Lumber Co.,

"By F. H. Turner."

Another letter from respondent to appellant, dated July 24, 1907, on the same subject, is as follows:

"Sattley, Cal., 7-24-07.

"Tonopah Lumber Co., Tonopah, Nevada—Gentlemen: On the 18th ult., we wrote you asking if you would want some of the lumber in the cutting order you gave us surfaced, and if so, please let us know what thicknesses it should be. As yet, we have not received a reply. Kindly let us know as soon as convenient. Would also like to receive your cutting order for the balance of 300,000 feet on the contract, per your letter of May 6th. We can commence shipping soon after the first of next month.

"Yours respectfully,

"Turner Lumber Co.,

"By F. H. Turner."

Respondent's letter of September 20 pertains to the same subject, namely, the sizing of the lumber, and urges appellant to give them information on that subject. It is as follows:

"Sattley, Cal., Sept. 20, 1907.

"Tonopah Lumber Co., Tonopah, Nev. — Gentlemen: We have written you twice asking you if any of the lumber on the order you gave us is to be surfaced or sized. As yet we have received no reply. We have quite a lot of the order on hand and as the season is getting late we are anxious to commence moving the lumber as we have to haul it with teams to the railroad. If you will kindly advise us as to the lumber you want surfaced or sized— if any—and give the thicknesses and widths desired we

can commence running it out and hauling it to the R. R. and have it ready to ship when occasion requires.

"Hoping to hear from you soon, we remain,

"Yours respectfully,

"Turner Lumber Co.,

"By F. H. Turner."

As appears from the record, the first shipping order was sent to respondent by appellant on the 29th day of September, 1907; and nowhere does it appear that appellant gave any instructions to respondent as to surfacing and sizing the lumber contained in the cutting order of 700,000 feet, except in so far as the respective shipping orders, sent in on September 29, 1907, and subsequent thereto, designated the surfacing and sizing of each particular order.   With respect to this phase of the contract, the letter of appellant to respondent of date November 23, 1907, is significant.   It is as follows:

"Tonopah, Nev., November 23d, 1907.

"Turner Bros., Sattley, California—Gentlemen:   There will be no necessity for surfacing any of the material mentioned in our previous letter.   We cannot give you any assurance as to when this material will be ordered shipped, but will do our best to clear it up in as short a time as possible.   "Yours truly,

"Tonopah Lumber Company,

"Per A. Revert.

"AR-MF.                                              M. F."

As appears from the record, and from the undisputed testimony of respondent, the entire 700,000 feet of lumber, as contained in the cutting order of April 29, 1907, was milled by respondent.   Some of the lumber was hauled to the railroad at Loyalton, and some held in the mill yards.   It appears from the record that several shipping orders were sent to respondent by appellant subsequent to September 29; and it also appears from the record that respondent was in a position to fill these orders, having previously cut the lumber as per appellant's cutting order of April 29.   Some delays appear on the part

of respondent, which they contend were due to their having to size and surface the lumber after receiving the order, and on other occasions were due to the lack of cars.

It is the contention of appellant that respondent was unable, or at least failed, to comply with the terms of the contract, by failing to ship the lumber within the season of 1907; but in this respect the letter from appellant to respondent of October 26 is significant:

"Tonopah, Nev., October 26, 1907.

"Turner Bros. Lumber Company, Sattley, California— Gentlemen: Owing to depressed conditions here, will ask that you cancel order 1120, for a car of 2x12. Also cancel all orders that you may have for us for the present. Just as soon as conditions improve in this locality, we shall notify you to ship our orders. Kindly acknowledge receipt of this letter.

"Very truly,

"Tonopah Lumber Company,

"Per A. Revert.

"M. F."

This cancelation of previous orders was recalled on October 27 by the letter of appellant to respondent, as follows:

"October 27, 1907.

"Turner Bros. Lumber Company, Sattley, California— Gentlemen: Last evening we wrote you to cancel order 1120 for a car of 2x12 and also all other orders that you may have for us. We wish to recall this cancellation and ask that you let shipments come forward sending the 1x12 & 2x4 first. We are badly in need of the 1x12. Kindly give this matter your prompt attention, and oblige.

"Very truly,

"Tonopah Lumber Company,

"AR-MF.                          Per ———."

Following this, the record discloses a telegram, as follows:

"Tonopah, Nev. Turner Bros. Sattley. Cancel all orders except on by twelve Tonopah Lumber Co."

This wire is acknowledged by respondents by their letter of October 30, 1907, as follows:

"10-30-07. Tonopah Lumber Co., Tonopah, Nev.— Gentlemen: Your wire of today at hand. Two cars were shipped to you yesterday but we will hold further shipment until advised by you. Yours respectfully."

So far as the record discloses, the shipping orders canceled by appellant's wire of October 30, 1907, were never revived, and, so far as we may determine from the record, were held by respondent pursuant to their letter of October 30, wherein they stated they would hold further shipments "until advised by appellant."

It is the contention of appellant that respondent was guilty of a breach of the contract, inasmuch as the record discloses that on the last day of the year 1907 respondent was in arrears, or, in other words, had failed to deliver 311,843 feet of lumber.

[2] There are many elements in this case that might be considered as decisive of the controversy, and there are many phases of the law that might apply; but we deem it sufficient to say that, so far as the facts presented by the record disclose, the court had good and substantial evidence to warrant its finding that the defendant company, appellant herein, due to its delay in furnishing respondent with specifications as to surfacing and sizing, and due to its acts in canceling orders previously given, and never reviving the orders, was responsible for the delay in delivery.

There is some evidence in the record which goes to show that on some occasions respondent was unable to make prompt delivery of specific orders, due to climatic conditions and scarcity of transportation facilities on the railroad. But nowhere does the record disclose any complaint as to these minor details, coming from appellant.

Moreover, the record fails to disclose any notice of rescission or cancelation of the contract given by appellant to respondent; nor does the record disclose any acts on the part of appellant from which or by reason of

which respondent could reasonably have inferred that appellant considered the contract as rescinded, or that appellant intended rescission of the contract.

On March 1, 1908, respondent addressed a letter to appellant, part of which is as follows:

"We have on hand in Loyalton, ready for immediate shipment, the following lumber:  *  *  *  We would be very much pleased to ship this in the near future, as this is stock cut for you; would ask you to strain a point and take it."

To this letter, appellant replied:

"We are in receipt of your letter of March 1st, and beg to advise that we cannot at this time use any of the material contained in your letter of that date."

On May 25, 1908, respondent communicated with appellant, as follows:

"After looking over all our communications with you, we do not see any reason why you should not take the balance of the lumber you ordered from us on April 29th, 1907,—your order No. 1028. We therefore insist that you take this lumber as you agreed. The lumber was to have been shipped when dry, and we have held it ever since last fall, and now that the market has declined, we do not feel that this should be our loss. We would like to know just what you are going to do about this matter."

To the foregoing communication, appellant replied:

"We are in receipt of your letter of May 25th, and are surprised at the tenor of the same. If you will refer to our letters and orders, you will find that you were simply unable to take care of the orders that we would offer you, and for that reason we will ignore your letter entirely. You may take any action you may deem fit regarding our attitude and desire to say that under no circumstances will we take a foot of your lumber, as bluffing with us don't go. Futhermore, we intend to insist upon the payment of amount due Verdi Lumber Company. You have our sentiments in the matter, and now, gentlemen, proceed."

This letter might properly be termed a repudiation of

the contract by appellant, and in our judgment the court was warranted in finding that the breach of the contract took place on the date of this letter, to wit, May 27, 1908.

In this case, respondent had not only the means whereby to comply with the terms of the contract as made, but the record discloses that they did, in fact, mill and manufacture all of the lumber for which a cutting order was given them by appellant.

[3] The contract required the lumber to be shipped when dry, and there is nothing in the record from which we could infer failure on the part of the respondent to perform under this condition. This was a definite time, contingent upon the accomplishment of a certain condition of the product to be furnished; and, so far as the terms of the contract were concerned, respondent might justifiably have shipped the lumber to appellant without further order, when the lumber was dry.

The record discloses a letter in which respondent notified appellant that much of the lumber milled pursuant to the cutting order was dry and ready for shipment.

It was by appellant's request that, "owing to unsettled conditions," the lumber should not be shipped until further notice from them. This was a change in the conditions of the original contract, for which change appellant was responsible, and which change was made to suit the convenience and welfare of appellant. Moreover, appellant, in order to suit its convenience, delayed its orders for sizing and surfacing, and thereby caused new conditions to enter into the performance of the contract which were not contemplated in its original making; and these conditions, as we have already said, were brought about at the instance and request, and to suit the convenience, of appellant.

If the entire 700,000 feet of milled lumber was not shipped within the year 1907, it was because respondent sought to meet the convenience of appellant, at appellant's suggestion and request, by shipping the lumber in quantities and at times as and when appellant ordered, thus delaying the delivery of the lumber.

As we have already stated, so far as the terms of the contract prescribe, the respondent had a right to deliver the entire 700,000 feet of lumber, included within the cutting order, when the same was dry; and the record discloses that the lumber had been milled and was ready for shipment in the condition contemplated by the contract, to wit, dry, before the close of the year 1907.

It was due to respondent's act in acceding to a change from the original terms of the contract, which change was required by and for the convenience of appellant, that the lumber was not shipped within the year 1907.

We deem it unnecessary to cite the many authorities available to bear out our reasoning and conclusion in this case. Suffice it to say that in our judgment the reasoning set forth by Mr. Justice Miller, speaking for the Supreme Court of the United States, in the case of *Amoskeag Mfg. Co.* v. *United States*, where the conditions and questions were almost identical with those at bar, is applicable to this case and conclusive of the principal question of law raised. (*Amoskeag Mfg. Co.* v. *United States*, 17 Wall. 592, 21 L. Ed. 715.) To the same effect are the cases of *Boone* v. *Templeman*, 158 Cal. 290, 110 Pac. 947, 139 Am. St. Rep. 126, and *Bennie* v. *Becker-Franz Co.*, 14 Ariz. 580, 134 Pac. 280.

It is contended that the court erred in fixing the damages, for the reason that in computing the same the court did so on a basis of the market price at the time of the trial.

[4] If the computation of damages on this basis was error, we are convinced from the record that it was such an error as rather inured to the benefit of appellant, and therefore they cannot complain.

It follows that the judgment of the lower court, made pursuant to its findings of fact, should be affirmed.

It is so ordered.

## ON REHEARING

By the Court, McCARRAN, J.:

In the former decision by this court we held that in this case there was on the 27th day of May, 1908, a

repudiation by respondent of a contract between the parties. A rehearing was granted in the case to give further consideration to the contention of appellant that the trial court had applied an erroneous rule in assessing the damages.

One finding of the trial court is to the effect that:

"At the time of the bringing of this action, and at the time of the trial thereof, * * * said lumber could not be disposed of in the market for more that $14.50 per thousand feet."

This suit was commenced on July 10, 1908. The trial of the action was during the month of March, 1909. The repudiation of the contract by respondent took place on May 27, 1908.

Whatever the finding of the court may be, it is apparent from the record that the court had the correct rule in view during the trial and tried the case in the light of such rule. After a question by respondent's counsel as to what price respondent received for lumber which was included in the cutting order, the court, in ruling upon an objection, made the following observation:

"If it is sold for less than the market price, of course that is a matter of proof also. If a contract is repudiated for the sale of personal property, it would be the duty of the plaintiff to prevent a further accumulation of damages by disposing of the property if he could do so. And I think the value of the property at that time is proper testimony for the purpose of showing the difference between the contract price and the price that he could obtain for it. Of course, the question as to whether he sold that property, or that lumber, for less than the market value at that time, can be shown by the defense in this case. But I think it is one of the elements to show what the party did with the property—with the lumber."

Professor Williston, in his work on Sales (p. 966, *et seq.*), after discussing the subject at length, says:

"The matter may, therefore, be summarized that the measure of damage is the difference between the contract price and the market price of the goods at the

time and the place when the contract should have been performed.  *  *  *  Though the market value at the time and place where delivery should have been accepted under the contract is the exact matter to be determined, that value sometimes cannot be determined directly."  .

The contract in the case at bar called for the delivery by respondent to appellant of 700,000 feet of lumber at Boca, a point on the main line of the railroad, and one of the places where the Truckee River schedule of prices prevailed.

This case presents what might be termed unique conditions.  The mill of the respondent company was situated at Sattley, a small hamlet in Sierra Valley far remote from any market center.  In order to reach the main line with the lumber manufactured at this mill it was necessary to convey the same by teams to the nearest railroad and there ship on a branch line to Boca, designated as the place of delivery in the contract involved herein.

The contract was entered into between appellant and respondent during a time at which unusual conditions prevailed in the mining centers of Nevada.  Toward the latter part of 1907, as the record discloses, a general business depression set in at these localities.  This depression materially affected the lumber market; hence we find from the record a general slump, so to speak, in the lumber market in this locality during the latter part of 1907 and during all of the year 1908.  After the refusal on the part of appellant to accept the lumber under its contract with respondent, the latter found itself with a large quantity of lumber on hand, milled pursuant to the cutting order of appellant, far remote from a market center, confronted with these conditions of business depression.

That this general depression in the lumber market prevailed is manifest from the testimony of the witness C. T. Bliss, manager of the Hobart Mills, called to testify in behalf of appellant.  He states, in substance, that lumber of a character involved in the contract was selling, delivered at Truckee River points, during the year

1907, at from $18 to $20 per thousand. He states that the mills with which he was connected acted independently in the fixing of its price for lumber; that there was no concert of action by the various mills tributary to Truckee River shipping points in fixing the price of lumber, although mills followed the price fixed by his company, in general. From his testimony it is disclosed that during the early part of the year 1908 the price fixed by his company for lumber of the character involved in the contract was reduced from $18 to $16 per thousand. There is nothing in the testimony of this witness from which it might be determined that No. 1 common lumber in quantity could be sold in the market during the year 1908 for as high a price as $16 per thousand. It is significantly established by the testimony of this witness that the price fixed by his company was for lumber ordered, and that the demand for lumber during the year 1908 had greatly decreased owing to prevailing conditions.

From the testimony of the witness F. H. Turner and the witness J. M. Turner, the principals in the respondent coporation, it is disclosed that the market price for lumber of the character contemplated by the contract on the 27th day of May, 1908, the date of the repudiation of the contract, as well as at or about the time of the commencement of the suit herein, at Truckee River points, or at least at Boca, the place of delivery, was $12 per thousand. Moreover, it is disclosed from the testimony of the witness F. H. Turner, in substance, that his company "peddled around in wagons" about a hundred thousand feet of the lumber included in the cutting order, at the price of $12 and $12.50 per thousand.

To the interrogatory, "What efforts, Mr. Turner, did you make to sell that lumber?" the witness replied: "Tried the companies here and at Reno, offering it for $14.50 to $14. They told me no, that they could do better over the N.-C.-O."

It is disclosed, however, from the evidence of the witness Turner, that his company disposed of one car

containing about 25,000 feet at Boca for $16 per thousand, and shortly thereafter three carloads were disposed of at Boca for $14 per thousand.

It is apparent that the testimony affecting the question of the market price of lumber appears to have been directed generally, and by the trial court limited, to the time of the breach and the period immediately thereafter.

We are unable to determine as to the exact method of calculation by which the trial court arrived at the conclusion that the market price for the lumber at the time of the repudiation of the contract, or at any time after the 27th day of May, 1908, was $14.50 per thousand. Suffice it to say, in this respect, that the price arrived at by the trial court was much more favorable to appellant than what appears to be established by the evidence in the case; and this being true, the appellant herein cannot be heard to complain.

The trial court, notwithstanding the finding entered herein, manifestly adhered to the correct rule in assessing the damages, and thereby determined that $14.50 per thousand was the market price of the lumber in question at Boca, the place designated in the contract as that of delivery, on the date of the breach of the contract or shortly thereafter. The trial court appears to have applied this rule and this price to the lumber in the hands of respondent company at the time of the commencement of the action. It appears, however, that the actual selling price was taken as the market price by the trial court as to lumber disposed of by the respondent company prior to the commencement of the action. In this respect, however, it is our judgment that the rule followed by the trial court, being the correct rule, should have been applied to all of the lumber refused by the appellant company and milled by respondent pursuant to the cutting order. In other words, the market price of $14.50 per thousand having been established by the trial court as the market price of the lumber at the place of delivery at or about the date of the repudiation of the contract, the damages accruing to respondent should

have been assessed as being the difference between the market price of $14.50 and contract price of $18, or a loss to the respondent company of $3.50 per thousand.

The amount of lumber in the hands of respondent, milled pursuant to the cutting order of appellant and refused by the latter on the 27th day of May, 1908, was 565,913 feet. This amount, computed on the basis of $3.50 per thousand, would properly establish the amount of damages assessed against the appellant in favor of the respondent, *i. e.*, $1,980.69.

It is, therefore, ordered that the judgment of the trial court entered herein be modified, and that respondent herein, plaintiff in the court below, be awarded damages in the sum of $1,980.69, with legal interest thereon.

As so modified, the judgment is affirmed.